ing upon and before crossing each track, observation was made. There was a conflict of testimony as to the distance objects could be discerned, ranging from 3 to 200 feet. The testimony of deceased's companion tended to show that both he and deceased looked and listened before attempting to cross the track upon which they were struck, saw nothing, and heard nothing from the engine. A man about three feet in front of deceased, passing along the street, in the same direction, testified that he first saw the engine when it was about 3 feet away, and, on cross-examination, that he first saw it 12 to 15 feet away. Other witnesses state that they saw deceased when struck, from a distance of 20 to 60 feet away, and that they could see the engine for that distance. Others testified that objects were visible 200 feet away. Upon this testimony the court submitted the question of due care upon deceased's part to the jury, whether he looked and listened for the engine, or whether, if he exercised due care, under all the circumstances, he ought to have seen the approaching engine. The charge was quite as favorable to defendant as it was entitled. No complaints were made or exceptions taken by its counsel thereto.

I think the case, under all the evidence, was properly submitted. The evidence justified the jury, as before observed, in finding absence of care by the defendant. Whether, under the existing darkness, deceased could distinguish the engine, or, if able to do that, he could distinguish its unlighted end, and determine upon the instant that it was about to cross the street, I think were questions for the jury. It is quite possible that, under the darkened light, an object could be discerned some feet away, but whether distinctly or not is not certain, or whether it was at the time stationary or in motion might be difficult of determination, while the deceased was required to act at once. It seems, therefore, that whether he acted as a prudent and careful person would act under the circumstances was a question of fact.

Criticism of the testimony by defendant was proper for the consideration of a jury, and is not improper here; yet, upon this record, the court would not be justified in disregarding it. An examination of the exceptions to the admission of testimony has been had, but no substantial error is found therein. The judgment and order appealed from are therefore affirmed, with costs.

---

TROWBRIDGE et al. v. HARRISON et al.

(Superior Court of New York City, General Term.   January 3, 1893.)

SALE—DELAY IN DELIVERY.

A delay of nearly two months after entering into contract for the sale of several cargoes of sugar, to be imported on the sellers' vessels, before delivering the same, is not unreasonable, where it appears that the sellers had refused to accede to the purchasers' request to change the contract so as to stipulate for prompt delivery, and that a round trip to the place whence the sugar was to be procured might occupy from 40 to 60 days.

Appeal from judgment on report of referee.

Action by Henry Trowbridge and others against Charles C. Harrison and others for the difference between the contract price of a cargo of

sugar sold defendants and the price realized on a sale of the same, for defendants' account, on their refusal to accept it. From a judgment in plaintiffs' favor, entered on the report of a referee, defendants appeal. Affirmed. .

The cause was referred to Henry E. Howland; Esq., who filed the following opinion on January 3, 1893:

"Plaintiffs and the defendants made contracts on the 19th and 20th of September, 1889, by which the plaintiffs sold to the defendants a quantity of Barbadoes sugar, and also a quantity of Antigua sugar. The parties had dealt for several years together, and the defendants were therefore well acquainted with the plaintiffs' method of doing business. The plaintiffs used their own sailing vessels, sailing from New York city, to import the sugars; and it is evident from the testimony that the contracts in question were made with direct reference to the course of the plaintiffs' business, and that the sugars were to be shipped upon the plaintiffs' vessels in the due course of their business. The contracts were separate contracts. The one for the Barbadoes sugar named the vessels by which the sugar was to arrive. The contract for the Antigua sugar provided that the sugar was to arrive per vessel or vessels to be named, (to be shipped.) On the day following the making of the two contracts, the contract as to the Antigua sugar was amended to correspond with the amount of sugar which the plaintiffs actually had for sale, they having found that a larger quantity of sugar was included in the contract than they placed to be sold. The defendants subsequently requested, on the 23d of September, a change to be made, and the words 'prompt shipment' to be inserted in the contract, and this change the plaintiffs declined to make. The Barbadoes sugar arrived on the vessels named. Part of the Antigua sugar was received and accepted by the defendants, and the plaintiffs notified the defendants on the 10th of October that the ship Atlantic was at Barbadoes, and was expected to go to Antigua to take the balance of the Antigua sugar. On the 15th the plaintiffs further notified the defendants that the Atlantic would complete the shipment of Antigua sugar,—the sailing date to be advised later,—and again, on the 21st of October, notified them that the Atlantic was loading at Antigua; and on the 26th of October defendants notified plaintiffs that they could not consent to receive the cargo of Antigua sugar by the Atlantic under the contract of the 19th of September. The sugar arrived on the 14th of November; was duly tendered to the defendants, who declined to receive it. It was sold for their account, and claim is now made for the difference between the contract price and the amount realized, which difference amounts to the sum of $3,865.60.

"It is claimed that, in the absence of any specified time when the Antigua sugar should be shipped, it should have been shipped within a reasonable time; and the question to be determined is whether the Antigua sugar, which came by the Atlantic, was shipped within a reasonable time. It is clear that the contracts were made with full knowledge of the course of business of the plaintiffs, that they were unable to name the vessels that should bring the Antigua sugars, and that it was understood that they should come by the first vessels of the plaintiffs which could bring them. That understanding was made clear to the defendants by the refusal of the plaintiffs to modify the contract a very short time after it was made; and then, if at any time, was the opportunity given to repudiate the contract, if it was not satisfactory to the defendants, by reason of any misrepresentation. It appears by the testimony that the length of a voyage from New York to the Windward islands is from ten to twenty days, depending upon the wind and weather; that ordinarily twenty days might be occupied in loading, and the length of the voyage home would be governed by the same conditions as the outward voyage, and that the round trip might occupy from forty to sixty days. It is apparent, also, from the correspondence, that the plaintiffs expected vessels that arrived sooner than the Atlantic to bring the Antigua sugars, and some of it was brought by other vessels, and accepted by the defendants. The Atlantic sailed from New York on the 11th of September, on her outward voyage. It is fair to suppose that she might have reached Antigua, and loaded and returned, sooner than she actually did. It was by no means certain that she would bring the sugar, but that other vessels might do so. In case other vessels did not bring the Antigua sugar, she was to do so. There seems to have been no unnecessary delay, and as full dispatch on the part of the plaintiffs as they can make. They notified the defendants as soon as they learned themselves of the position of their vessels, and of the cargoes they would bring, and

there is no evidence of any bad faith or any misrepresentations to induce the making of the contracts. It was for the plaintiffs' interests to send the cargo as soon as possible, and, if the defendants had made more particular inquiries as to the position of the plaintiffs' vessels, they would have learned all about them. They waited until some days after they were informed of what vessels the Antigua sugars were to come by before refusing to accept them; and it seems to me there was proper dispatch, and that no defense exists to the claim by reason of the failure of the plaintiffs to bring the sugars within a reasonable time, considering the ability of the plaintiffs, and the knowledge of the defendants as to their course of business, and I therefore give judgment for the plaintiffs."

Argued before FREEDMAN, McADAM, and GILDERSLEEVE, JJ.

Arnoux, Ritch & Woodford, for plaintiffs.

J. E. Parson, for defendants.

PER CURIAM. The judgment should be affirmed, with costs, upon the opinion of the referee.

---

## MARTIN v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, General Term, Fifth Department. January 18, 1893.)

RAILROADS—ACCIDENT AT CROSSING—CONTRIBUTORY NEGLIGENCE.

   One who stops 180 feet from a crossing to look for a train, and then drives forward at a speed of 6 or 8 miles an hour, is guilty of negligence, although he may have continued to look, and only have seen the train after it was too late to stop.

Motion for new trial on exceptions.

Action by Frank B. Martin against the New York Central & Hudson River Railroad Company. Judgment of nonsuit, after which plaintiff moved for a new trial on exceptions directed to be heard in the first instance at the general term. Motion denied, and judgment directed for defendant.

Argued before DWIGHT, P. J., and MACOMBER and LEWIS, JJ.

A. W. Shurtleff, for appellant.

Camp & Dunwell, for respondent.

LEWIS, J. This action was brought to recover damages for injuries sustained by the plaintiff, caused by his coming in collision with one of the defendant's engines at a highway crossing. Defendant's negligence was established. The plaintiff was nonsuited because he failed to show himself free from negligence contributing to his injuries. The undisputed evidence showed that the plaintiff approached the crossing upon the highway in an open wagon drawn by a gentle, manageable horse, in the daytime. He stopped at the distance of 180 feet from the crossing, and looked and listened, and, not seeing or hearing an approaching train, he started up his horse, and drove on to the place of collision at a speed of from 6 to 8 miles an hour. He saw the approaching engine just before the collision, and tried to stop his horse, but was not able to do so in time to avoid the collision. In explaining why he did not stop in time to avoid the accident, plaintiff testified, "A man going on a good road gait cannot stop in a minute." While he testified that he continued to look and listen up to the time of the accident, and did not see